LOUCKS *v*. DIAMOND CHAIN & MANUFACTURING CO.

[No. 27,518.   Filed March 10, 1941.]

*Bernard Stroyman,* of Indianapolis, for appellant.

*George C. Forrey, III, Edward J. Boleman, Burrell Wright* and *Jacob S. White,* all of Indianapolis, for appellee.

FANSLER, J.—This was a proceeding before the Industrial Board under the Indiana Workmen's Occupational Diseases Act (Acts 1937, ch. 69, p. 334, § 40-2201 et seq., Burns' 1940 Replacement, § 16499 et seq., Baldwin's Supp. 1937). The Industrial Board found that the appellant's disability is neither directly nor indirectly due to any occupational disease.

The action of the board was reviewed by the Appellate Court upon application of the appellant. Following the statute, error was assigned on the ground that the award is contrary to law. This assignment presented the question of whether the facts found and the evidence supporting them were sufficient to sustain the board's action. The Appellate Court affirmed the award, and the appellant has filed with this court a petition to transfer, asserting that the Appellate Court was in error in concluding that the facts established and the evidence before the board were sufficient to sustain its conclusion.

It is clear that the question involves due process, and that in such a case this court will review the action of the Appellate Court in proceedings under the Indiana Workmen's Compensation Act (Acts 1929, ch. 172, § 61, p. 536; § 40-1512, Burns' 1940 Replacement, § 16437, Baldwin's 1934). *Warren* v. *Indiana Telephone Co.* (1940), 217 Ind. 93, 26 N. E. (2d) 399. The procedure under the Indiana Workmen's Occupational Diseases Act, *supra,* is practically the same as under the Indiana Workmen's Compensation Act, and what was said in the case last cited applies equally to both.

The sufficiency of the petition, denominated a petition to transfer, to invoke the jurisdiction of this court, is not questioned.

The Appellate Court concluded from a consideration of the evidence that the board could reasonably conclude that the disability of appellant is not due to an occupational disease arising out of and in the course of his employment. The correctness of this conclusion is the only question involved. If the finding of the board rests upon a substantial factual foundation, it will not be disturbed, and where there is a substantial conflict in the evidence, the decision of the court will not be substituted for a decision of the board.

The evidence shows that the appellant, who was 33 years old at the time these proceedings were begun, worked for two and one-half years for the appellee as a tool hardener. The occupation consisted of treating tools, machine parts, etc., by heat, in furnaces, at very high temperatures, after which they were treated in baths of certain chemicals. He worked at three furnaces, one of which, a heavy-duty electric furnace, was equipped with gas which burned continuously while the

furnace was in operation for the purpose of producing carbon monoxide, which affects the metal which is being treated. Each of the furnaces is equipped with a peephole, through which the operator watched while the articles were being treated. The doors were opened at intervals ranging from fifteen seconds to three minutes, and the operator was required to stay directly in front of the furnaces. One furnace and a portion of another were equipped with a hood to carry away fumes and excess heat. The heavy-duty furnace was without a hood. Certain of the salts used at times in the quenching baths gave off poisonous fumes. A chemist formerly employed by the appellee testified that he had occasion quite frequently to observe the work being done in the heat-treating department; that it is necessary to have the carbon monoxide to prevent the scaling of steel; that the workmen work in abnormally high temperatures; that the furnaces necessarily produce carbon monoxide in excess of that which will combine with oxygen; that this is true in a well-conducted heat-treating furnace; and that, unless there is an excess, the metal which is being treated will become oxidized and unfit for use.

In 1937 the appellant began to have pains in the back and kidney disturbances and experienced fatigue. He complained to his foreman that there was not sufficient ventilation to carry off the impurities and fumes in the air. He became worse, and in May, 1938, he suffered what he, and the doctor who saw him at the time, termed a collapse. He became extremely dizzy, had a feeling of suffocation, and was unconscious. Since that time he has lost considerable weight. He was first treated by a doctor in June, 1937, and it was found that he was suffering from a kidney infection, which was diagnosed as due to the inhalation of poison-

ous gas. In May, 1938, when he suffered a collapse, he was brought to the doctor's office, with the assistance of an elevator operator. The doctor worked with him about four hours. Examinations by several doctors disclosed no organic trouble, and it was concluded by three doctors, after many thorough examinations, that he was suffering from polycythmia, caused by carbon monoxide poisoning. There was no medical testimony to the contrary, although one other doctor testified that he had not made up his mind as to the cause of the trouble. There was evidence that the condition from which the appellant was suffering was generally recognized by the medical profession as being characteristic of the type of work in which he was engaged; that as little as five-hundredths of one per cent. of carbon monoxide gas is toxic if one is exposed to it over a long period of time. An expert, who made certain tests when the heavy-duty furnace was not using gas to manufacture carbon monoxide, said that when it was used for that purpose without a hood the workmen breathing the air would necessarily inhale the fumes, and one of the doctors said that he could not see how the appellant could help breathing carbon monoxide while working at furnaces equipped to produce carbon monoxide, the doors of which are being opened and shut almost constantly, especially in the high humidity and the high thermal environment in which he worked. He testified that, in his opinion, the appellant's condition is permanent, and that he will not be able to engage in any work requiring physical exertion.

There is no substantial conflict in the evidence. It is true that certain tests were made to discover carbon monoxide gas, and that an insufficient amount to be injurious was reported, and that the appellant was present when the tests were made. But at the time

these tests were made, only the furnaces covered by the hood were producing carbon monoxide, and the heavy-duty furnace, which was unhooded and which produced carbon monoxide gas continuously when appellant was working, was not using gas, nor was there continuous operation of the furnaces on a production basis. Small pieces of scrap metal were used, and the doors of the furnaces were opened only a few times in the two hours in which the tests were made. The appellant testified that the "operation," that is, the manner of doing the work, during the time the tests were made, was substantially the same as while he was employed, except that it was not carried out on a production basis; but he also testified that the heavy-duty, unhooded furnace was not producing carbon monoxide; that the doors of the furnaces were opened quite infrequently as compared with opening them at intervals of from fifteen seconds to three minutes in production operation. The tests therefore were not made under comparable conditions, and it is clear that the appellant did not intend to convey the impression that the conditions were comparable.

There was evidence, undisputed, of excess monoxide gas in the heavy-duty furnace and that the appellant could not escape inhaling it when the doors were being constantly opened; that very small quantities of this gas over a long period could create his condition; and that medical literature reports many cases characterized by the condition from which the appellant is suffering, and that they generally involve workmen engaged in the same line of occupation. The circumstance of being exposed to the poisonous gas, and being in a physical condition generally attributed by medical science to poisoning from that gas, and the absence of, and inability of the doctors

to discover, any other possible cause for his condition, seem sufficient to establish that he was the victim of an occupational poisoning. Practically all of the facts and circumstances in evidence tend to support this view, and we have been unable to find in the record any substantial evidence to the contrary.

The conclusion of the Appellate Court seems to have been based upon the theory that the evidence concerning the tests above referred to was sufficient to create a substantial conflict, but, as we view this evidence, after carefully examining the entire record, we have concluded that the conditions under which the tests were made were so different from the conditions under which the appellant worked that the result of the tests is of no substantial value.

Judgment reversed, and cause ordered remanded to the Industrial Board for further proceedings not inconsistent with this opinion.

NOTE.—Reported in 32 N. E. (2d) 308.